**Margarito SALMON, Magdalena Salmon, Individually and as next friend for Margarito Salmon, Jr., Plaintiffs–Appellees,**

v.

**Martin R. SCHWARZ and Arturo A. Gonzalez, Defendants–Appellants.**

**No. 88–1850.**

United States Court of Appeals, Tenth Circuit.

Oct. 31, 1991.

Freddi Lipstein, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C. (John R. Bolton, Asst. Atty. Gen., William L. Lutz, U.S. Atty., and, John F. Cordes, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., with him, on the brief), for defendants-appellants.

Kevin J. Hanratty, Artesia, N.M., for plaintiffs-appellees.

Before HOLLOWAY and LOGAN, Circuit Judges, and BROWN,* District Judge.

* Honorable Wesley E. Brown, United States District Judge for the District of Kansas, sitting by designation.

## ORDER

On consideration of the Motion to Clarify the Court's Opinion Issued on August 27, 1991, of the Defendants–Appellants, and the response thereto of the Plaintiffs–Appellees, the court finds that its August 27, 1991, opinion should be modified. The motion to clarify advised the court of an error in the statutes relied on and suggested the necessity of a material clarification, which the court appreciates. The response agrees with the clarification suggested.

Accordingly, the court withdraws its opinion filed August 27, 1991 and vacates the judgment entered pursuant thereto. An amended opinion is filed this date and judgment is entered pursuant thereto.

Before HOLLOWAY, Chief Judge, LOGAN, Circuit Judge, and BROWN *, District Judge.

## AMENDED OPINION

HOLLOWAY, Chief Judge.

This is an appeal by the defendant-appellants, Arturo A. Gonzalez and Martin Schwarz, from the district court's denial of their motions for summary judgment. Both Gonzalez and Schwarz are Special Agents of the Federal Bureau of Investigation (FBI) who claim that they are immune from suit for allegedly wrongful acts in obtaining and executing an arrest warrant for Margarito Salmon (Salmon), and resulting claims for damages by Salmon, his wife and son.

### I

In early 1984 the FBI in Albuquerque, New Mexico, was contacted by the Detroit Division of the FBI regarding an investigation into narcotics laws violations by subjects in Detroit traveling to Artesia, New Mexico, for the purpose of buying heroin. I R., Doc. 91 at 2 (Gonzalez, summary judgment affidavit). As a result, the Bureau's Albuquerque field office conducted physical surveillance of several suspected narcotics traffickers in Artesia, New Mexico. In July 1984 the surveillance intensi-

fied as the FBI obtained judicial authorization to intercept the suspects' wire communications and to install a pen register on one suspect's telephone. According to the defendants the surveillance was complicated because the suspects spoke Spanish which necessitated the transfer of Spanish-speaking agents to Artesia from other areas. These agents found it difficult to identify the participants in the monitored conversations because they lacked prior knowledge of the suspects.

The police logs of intercepted telephone calls show that one suspect, Carrera, often phoned someone called "Margarito." Gonzalez intercepted one such call to "Margarito" involving illegal drugs on August 5, 1984. The police logs for that day merely identify the person called as "Margarito LNU" (last name unknown). Three days later Carrera received a call allegedly involving drugs from "Pepe" who resided in Juarez, Mexico. Immediately following this discussion, Carrera phoned the Plainsman Phillips 66 gas station (Plainsman 66) and asked to speak to Margarito. After Carrera was informed that Margarito was not at the station, Carrera immediately dialed another number and asked for Margarito. Although Carrera never mentioned Margarito's last name in any of the intercepted calls or gave any further identification evidence, this last telephone number called proved to be Margarito Salmon's. I R., Doc. 134; Memorandum Opinion and Order at 3. Salmon never received Carrera's call because he was not at home. *Id.* at 4.

Gonzalez claims that the sequence and nature of these calls caused him to conclude that Salmon was the unidentified "Margarito" involved in illegal drug transactions. *Id.* at 3. Gonzalez' conclusion was reinforced by a physical surveillance report on September 12, 1984, which showed that someone fitting Salmon's description was observed driving a Ford pickup truck registered to Salmon that had been parked at Carrera's residence.[1] *Id.* at 3–4.

---

1. Salmon also later acknowledged during a deposition on September 10, 1987, that he had asso-

Subsequent entries on the wire interception logs indicate that Carrera also telephoned another Margarito, Margarito *Alvarado* (Alvarado), calling Alvarado's home 38 times and his workplace, the Plainsman 66, over 14 times. *Id.* at 4. Gonzalez also acknowledges that he knew that Alvarado worked at the Plainsman 66 as of August 5, 1984. I R., Doc. 91, Ex. A (Gonzalez' Affidavit of 10/2/87 in support of his motion for summary judgment, at 5).

On the basis of Gonzalez' affidavit of November 9, 1984, for an arrest warrant, a federal magistrate issued an arrest warrant for several of the suspects, including Salmon, on that same day. Salmon's arrest warrant charged him with conspiring and attempting "to distribute, dispense or possess a controlled substance and ... travel[ing] in interstate commerce and us[ing] interstate communication facilities to facilitate" such enterprise in violation of 21 U.S.C.A. §§ 843(b) and 846. I R., Doc. 13, Ex. A at 9, 75 (arrest warrant and Gonzalez' supporting affidavit); Appellants' Br. at 7.

On November 13, 1984, Salmon and his family were awakened in the early morning by Schwarz and others, not including Gonzalez, who accused Salmon of being involved in illegal drugs and then arrested and handcuffed him in front of his wife, Magdalena Salmon, and their son, Margarito Salmon, Jr., the other plaintiff-appellees in the instant case. Schwarz searched Salmon's residence as well as his place of business, a barber shop and boutique known as Margarito's Styling Shop. Appellees' Br. at 6. Salmon admits having consented to the search of his residence; however, he denies consenting to the search of his shop. *Id.* at 6; Appellants' Br. at 8. Gonzalez did not join Schwarz and the other agents in executing the arrest warrant and the related search.

Subsequently the charges against Salmon were dropped. However, two other persons arrested in the investigation pleaded

guilty, two fled and two were acquitted. Along with his wife and son, Salmon filed suit seeking compensatory and punitive damages from the defendants Gonzalez and Schwarz. Salmon contends that they violated his Fourth Amendment rights to protection against unreasonable search and seizure and that warrants issue only upon probable cause (Count I).[2] Salmon further claims he was injured by the defendants' tortious conduct of false imprisonment (Count II), trespass (Count III), battery (Count IV) and that his civil rights were violated (Count V). In addition, Magdalena and Margarito, Jr. each claim damages for the negligent infliction of emotional distress. (Counts VI and Count VII, respectively).

Gonzalez and Schwarz moved to dismiss, arguing that Salmon's constitutional claims lacked sufficient specificity; that they were entitled to absolute official immunity from the Salmons' state law tort claims; and that as federal agents, their actions did not satisfy the state action requirement for applying 42 U.S.C.A. § 1983. I R., Doc. 13 at 1–8 (Defendants' Memorandum in Support of Motion to Dismiss). After considering affidavits from both sides in support of their positions, the district court ruled that it would treat the defendants' motion to dismiss as a motion for summary judgment, pursuant to Fed.R.Civ.P. 12(b), as to the issues of immunity and probable cause. I R., Doc. 37, Memorandum Opinion at 1.

The court denied the defendants' motion for summary judgment. It found that Salmon's Fourth Amendment claims were sufficiently specific to raise a genuine issue of material fact about whether the affidavit in support of the arrest warrant established probable cause to arrest Salmon. Moreover, in light of such a claim of a constitutional violation, the court ruled that the defendants were entitled to assert "only qualified immunity, not absolute immunity". *Id.* at 3–4. The court declined to

ciated with Carrera. III R. at 26–30.

**2.** Salmon bases his Count I claim on *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). There

the Court held that a Fourth Amendment violation of rights may give rise to a federal action for damages against the individual federal employee involved.

rule whether the affidavit and other supporting evidence constituted probable cause for the arrest and searches, reserving such questions for additional discovery and trial. *Id.* at 5, 9.

The district judge also rejected the defendants' claims that their actions were discretionary and that they were entitled to absolute immunity from Salmon's common law tort claims. Instead, the court found that the defendants' duty to obtain warrants is not discretionary because police officers' actions in seeking an arrest warrant and in making an arrest are measured by a well-known standard—probable cause. *Id.* at 7–8. Furthermore, even if their actions were discretionary, the court ruled that granting them absolute immunity from tort liability would undermine the policy of deterring police misconduct. *Id.* at 8.

The district court dismissed Count V of Salmon's complaint, which alleged that the defendants violated his civil rights, giving rise to a claim under 42 U.S.C. § 1983. The court found that the defendants, as federal officials, were not acting under of color of state law for the purpose of invoking § 1983. *Id.* at 5. That ruling has not been appealed.

Following some discovery, the defendants moved for summary judgment a second time. Each agent asserted the defense of qualified immunity to Salmon's constitutional claims and absolute immunity to the state law tort claims. The district court rejected this second motion, concluding that the "incomplete list of conflicting evidence clearly shows that a genuine issue of material fact exists as to the reasonableness of Defendants' actions." I R., Doc. 134 at 4. The judge also rejected the defendants' contentions, raised earlier by their first summary judgment motion, that they are entitled to absolute immunity from the Salmons' state law claims. *Id.* at 5. The court decided that the defendants' actions were not discretionary, but instead were subject to a "fixed and readily ascertainable standard" of probable cause. *Id.* Therefore, the defendants' actions were only subject to the doctrine of qualified

immunity, and not covered by the defense of absolute immunity.

## II

Defendants both vigorously claim qualified immunity as to Salmon's constitutional claims of Fourth Amendment violations.

■ When government officials abuse their offices, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). On the other hand, permitting damage suits against them can entail substantial costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit the discharge of their duties. *Id.* The Supreme Court has accommodated these conflicting concerns by providing government officials performing discretionary functions with a qualified immunity. *Id.* The doctrine provides officials with an objective standard for anticipating when their conduct might expose them to liability for damages. It allows liability only where a reasonable person would have known that his conduct "violates 'clearly established statutory or constitutional rights.' " *Burns v. Reed,* —— U.S. ——, 111 S.Ct. 1934, 1944, 114 L.Ed.2d 547 (1991) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

■ The Court recently "clarif[ied] the analytical structure under which a claim of qualified immunity should be addressed" in *Siegert v. Gilley,* —— U.S. ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The Court emphasized that qualified immunity is more than just an affirmative defense to liability; it is an " 'entitlement ... to *immunity from suit* ...' and 'is effectively lost if a case is erroneously permitted to go to trial.' " *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)) (emphasis in original). Accordingly, the district court's refusal to grant summary judgment on the instant qualified immunity claims is an appealable decision under 28 U.S.C.A. § 1291 (1988). *Eastwood v. Okla. Department of*

*Corrections of the State of Oklahoma,* 846 F.2d 627, 629 (10th Cir.1988).

■ When the defense is raised by such a motion " '[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred....' " *Siegert v. Gilley,* —— U.S. at ——, 111 S.Ct. at 1793 (1991) (quoting *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738). If the plaintiff is successful in showing that the law was clearly established and that the defendant's conduct violated the law, then the defendant, as the movant for summary judgment, must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions. *Archer v. Sanchez,* 933 F.2d 1526, 1530 (10th Cir.1991); *Coen v. Runner,* 854 F.2d 374, 377 (10th Cir.1988); *Pueblo Neighbor Health Centers, Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988).

## III

### A.

■ We consider first the defendants' contention that they were entitled to summary judgment on the basis of qualified immunity from Salmon's constitutional claim asserted in Count I. The count alleged that Gonzalez and Schwarz violated Salmon's Fourth Amendment rights by causing his arrest without probable cause. In analyzing defendants' immunity for this arrest, we evaluate the "objective reasonableness" of the defendants' actions measured against clearly established law at the time of Salmon's arrest. *Burns,* —— U.S. ——, 111 S.Ct. at 1944 n. 8; *Campbell v. Mercer,* 926 F.2d 990, 992 (10th Cir.1991).

■ We must decide whether the defendants could have believed, under the *Burns* standard of "objective reasonableness,"

that probable cause existed for the issuance of Salmon's arrest warrant. *Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1985).[3] *Malley v. Briggs,* 475 U.S. at 345–46, 106 S.Ct. at 1098–99, rejected the official's argument that he was shielded from damages liability because his act of applying for a warrant is *per se* objectively reasonable, provided that the officer believes that the facts alleged in his affidavit are true; instead, the inquiry is confined to the objectively ascertainable question whether a reasonably well-trained official would have known that the search was illegal despite the magistrate's authorization (citing *United ed States v. Leon,* 468 U.S. 897, at 911 n. 23, 104 S.Ct. 3405, at 3414 n. 23, 82 L.Ed.2d 677 (1984)). For a valid warrant to issue, it must appear from the affidavit that "there is probable cause to believe that an offense has been committed and that the defendant has committed it ...." Fed.R.Crim.P. 4; *Wong Sun v. United States,* 371 U.S. 471, 481 n. 9, 83 S.Ct. 407, 414 n. 9, 9 L.Ed.2d 441 (1963) (the requirements of the rules derive from the Fourth Amendment).

■ In *Anderson* the Court noted that a determination whether an arrest or search was "objectively legally reasonable ... will often require examination of the information possessed by the [arresting or] searching officials." 483 U.S. at 641, 643, 107 S.Ct. at 3039, 3041. Here, after examining the facts before Gonzalez, we are convinced that the trial judge was correct in holding there are material facts in dispute concerning whether probable cause existed for the arrest warrant; thus summary judgment was properly denied as to agent Gonzalez. *Archer v. Sanchez,* 933 F.2d at 1526, 1531. On the other hand, Schwarz did not participate with Gonzalez in the application for the arrest and search warrants, as the record clearly shows. III R. at 12 (Gonzalez' Deposition 11/16/87), 16–17 (Schwarz' Deposition 11/16/87). Therefore, he bears no liability for any lack of

---

**3.** In *Malley,* the Court was concerned only with a damages action for an officer's role in an allegedly unconstitutional arrest. 475 U.S. 335, 106 S.Ct. 1092. The Court concluded "that the distinction between a search warrant and an arrest warrant would not make a difference in the degree of immunity accorded the officer who applied for the warrant." *Id.* at 344 n. 6, 106 S.Ct. at 1097 n. 6.

adequate probable cause to apply for the arrest warrant. Schwarz's only potential liability on Salmon's claims for damages concerns his execution of the warrant, which we discuss later.

■ As noted by the district court, Gonzalez relies principally on two "isolated instances—a phone call and a visit by Mr. Salmon to the home of one of the original suspects [*i.e.*, Carrera]" to justify his belief that Salmon was the same "Margarito" who was referred to often in the phone call logs as involved with narcotics violations. I R., Doc. 134 at 3.[4] Indeed, given his sixteen years' experience as an FBI agent, Gonzalez contends that the sequence and nature of the phone calls on August 8, 1984, *see* note 4, *supra*, and the later physical identification of Salmon's truck at Carerra's prior residence, resulted in a reasonably objective determination that probable cause existed to arrest Salmon and search his residence. I R., Doc. 91, Ex. A.

We disagree. If the information described in Gonzalez' affidavit represented the only material evidence concerning probable cause, or presented a reasonably full account of the relevant events leading up to Salmon's arrest and search, a thin case

for the warrant might exist. However, Gonzalez' contentions on appeal, as well as his affidavit for the warrant, ignore important material facts. The facts Gonzalez relies on, considered collectively, present an incomplete picture of the circumstances relevant as to whether probable cause existed for Salmon's arrest and search. Salmon points out that there was not only inherent weakness in what Gonzalez stated in his affidavit, but also that his affidavit made material omissions. *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir.1990), *petition for cert. pending*, No. 90–1818, 5/28/91, (citing *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir.1990) (probable cause finding undermined and recklessness inferred when critical facts omitted from supporting affidavit)).

For example, Gonzalez admits in an affidavit dated October 2, 1987, that he knew that Margarito *Alvarado*, and not Margarito *Salmon*, worked at the Plainsman 66 at least three months before Salmon's arrest. I R., Doc. 91, Ex. A at 5; *see also* III R. at 21, 26 (Gonzalez' Deposition). In fact, Gonzalez acknowledged that he had no evidence linking Salmon to the Plainsman 66.[5]

---

4. In his affidavit in support of the second motion for summary judgment, Gonzalez stated:
   11. On August 8, 1984, at approximately 11:04 a.m., Alberto Carrera received a telephone call from "Pepe" who was known to reside in Juarez, Chihuahua, Mexico. Carrera advised Pepe that he would be leaving tonight; that Carrera wants two (2) and that another individual wants four (4) but needs to see if the 'motor is OK.' Based on my experience, training and familiarity with jargon used by drug traffickers, I concluded that the numbers two and four relate to kilos of illegal drugs and that 'the motor' was the illegal drugs....
   12. On August 8, 1984, at approximately 11:05 a.m., (immediately following Carrera's conversation with Pepe) Carrera dialed (505) 746–9950, the Plainsman Gas Station and asked for Margarito (last name not given). Carrera is informed that Margarito is not there....
   13. On August 8, 1984, at approximately 11:07 a.m., (immediately after attempting to contact Margarito at the Plainsman Gas Station) Carrera called (505) 748–2696, subscribed to Margarito Salmon, 1408 Hank Avenue, Artesia, New Mexico.... I concluded, from the immediately preceding conversations coupled with this inquiry, that Salmon was likely connected in some way to the il-

   legal drugs, and was probably the 'Margarito' in the August 5 conversation with Carrera....
   14. On September 12, 1984, at 12:17 p.m., an individual was observed driving a Ford pickup truck, New Mexico license plate ES 9508 which later parked at 1408 West Hank Avenue, Artesia. The driver was described as a Hispanic male, age about 37, 5'9" tall, 160 lbs., bearded with black, 'salt and pepper' hair. He was wearing a belt with the name 'Salmon' embossed on the back. This description matched that of Margarito Salmon, who lives at 1408 West Hank Avenue, Artesia. I was aware that this truck had been seen parked in the yard at 1506 North 10th Avenue, Artesia, residence of Alberto Carrera on at least one prior occasion. A query of the records of the New Mexico Department of Motor Vehicles at the time revealed that New Mexico license plate ES9508 was registered to Margarito Salmon, 1408 West Hank Avenue. I R., Doc. 91, Ex. A (Gonzalez' Affidavit in Support of the Defendants' Second Motion for Summary Judgment) at 5–7.

5. At his deposition, Gonzalez was questioned about the phone logs and his affidavit which contained some references to Margarito Salmon receiving phone calls at the Plainsman 66. He

Gonzalez knew that the Plainsman 66 telephone number was called over fourteen times and, moreover, that Margarito *Alvarado's* home phone number was called over thirty-eight times from the tapped phone. When asked by Margarito Salmon's attorney during his deposition about his reasons for not disclosing to the magistrate the large number of calls to Margarito *Alvarado's* home and workplace, Gonzalez replied: "As you can see from the affidavit, sir, I believe that I put in only that information that I felt was pertinent to the issuance of an arrest warrant by the U.S. Magistrate in Albuquerque." [6] III R. at 25. Earlier in the deposition Margarito Salmon's attorney asked: "What was the basis for excluding the information from the magistrate at that time that Margarito Alvarado worked at the Plainsman 66 gas station?" Gonzalez answered:

> It was not a conscious thing. It was something that I felt that Margarito Al-

varado, I know—I believed that Margarito Alvarado was involved in narcotics trafficking. I didn't feel that—it was my judgment, with the directive that we have for our Title 3 coverage, as a result of conversations with the U.S. Attorney's Office and my own purpose for doing that investigation, I felt that Margarito Alvarado was way below the level of trafficker that the FBI had been mandated to investigate. I always felt Mr. Alvarado would eventually be a witness.

*Id.* at 23–24. Thus the omission of some critical information clearly undermines the inference that Margarito Salmon is the anonymous "Margarito" involved in numerous monitored phone calls.

Additional information creating a genuine issue of fact that requires a refusal of summary judgment for Gonzalez here concerns conflicts of fact in the defendants' records.[7] Gonzalez admitted that there

---

**6.** Gonzalez was further questioned as follows:

admitted that there was no evidence linking Salmon to the Plainsman 66:

> Q. The references that you made in your affidavit to Margarito Salmon, some of which refer to Margarito Salmon as being contacted at the Plainsman 66, being the phone number 746–9950, do you agree with me now that that reference is incorrect and should refer to Margarito Alvarado?
> A. No, sir, as I told you before, I don't know. There's an inconsistency; the magnitude of it, I don't know. There is an inconsistency and whether the log is accurate or whether this is accurate versus the log or how it happened to be, I wish I could tell you at this moment. I don't know, sir.
> Q. You certainly agree with me that you weren't thinking that these phone calls going to the Plainsman 66, they were talking to Margarito Salmon, since you knew he worked at Margarito's Styling Shop?
> A. What would preclude Mr. Salmon from getting a phone call at the Plainsman 66, regardless of where he worked?
> Q. *Did you have any evidence linking Margarito Salmon to the Plainsman 66?*
> A. *No, sir.*
> Q. Was that a reasonable assumption for you to make then, that Margarito Salmon was receiving phone calls at the Plainsman 66?
> . . . .
> A. It was not the phone calls to the Plainsman 66 that aroused my suspicion, sir. It was, as I stated before, other circumstances.

III R. at 78–79 (emphasis added).

Q. All right. *And in your affidavit here, nowhere do you point out that Margarito Alvarado had been involved in a conversation involving a drug transaction; isn't that correct?*
A. *No, I didn't say that in my affidavit, I never made reference to [Margarito] Alvarado.*
Q. That's what I'm asking you. Don't you feel that's important information, that three minutes apart one Margarito was calling and then the next three minutes, the other one was calling, in your opinion?
A. Not for my objective. My objective was not—I didn't try to make my affidavit a summary of all of the names of all the people and all the phone numbers and all the investigation that had been conducted under that file. My affidavit was solely in support of an application for search warrants and arrest warrants. My intent was not to inform the U.S. Magistrate of everything that we had obtained in the course of our investigation.
. . . .
Q. You don't think the logs themselves indicate that Margarito that had been called was not Margarito Salmon, but Margarito Alvarado? And it was your language that you put in these reports stating it was Margarito Salmon; isn't that correct?
A. Yes, sir, that's why I'm saying, I wasn't trying to hide the fact from anyone that we were aware of Mr. Alvarado's involvement. I was very much aware of Mr. Alvarado's involvement. It was no shock to me that there was a Margarito Alvarado.

III R. 34–35 (emphasis added).

**7.** Gonzalez' affidavit for the warrant stated that in a November 5, 1984, conversation, Carrera

was an inexplicable "discrepancy" concerning references to "Margarito LNU" between the arrest affidavit (for Margarito Salmon) and in the letter to Lutz (concerning Margarito Alvarado). III R. 36–39. Moreover, when asked to explain how he knew that the calls to "Margarito LNU" on November 5 involved two different Margaritos and that one was Margarito Salmon, Gonzalez replied: "I can't tell you that, sir.... How did I arrive at that? Sir, I don't remember how I arrived at that." *Id.* at 36–37.

Another factual issue weighing against a finding of qualified immunity here concerns the phone calls on August 8, 1984 (*see supra* at 11, n. 4). Referring to the calls, Gonzalez stated in his affidavit: "I concluded, from the immediately preceding conversations coupled with this inquiry [a call from Carrera's tapped phone to Salmon's phone] that Salmon was likely connected in some way to illegal drugs.... I R., Doc. 91, Ex. A at 5–6.[8] However, this conclusion—and the rationale for the arrest warrant—are called into question by police logs attached to the affidavit that show Salmon did not receive a call from the tapped phone because he was not at home.

■ We are convinced that the record shows a genuine factual issue that undermines any claim of objective reasonableness to support a qualified immunity summary judgment. Moreover, we believe the law was clearly established at the time of Salmon's arrest that the omission of material information from an arrest affidavit violated the Fourth Amendment. In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Court ruled that if a police officer makes a false statement knowingly and intentionally, or with reckless disregard for the truth in an affidavit for a warrant, then the false statements must be disregarded in deciding whether the affidavit demonstrates probable cause. We held in *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir.1990), that the *Franks* standards of "deliberate falsehood" and "reckless disregard" extended to cover material omissions. *See United States v. Owens*, 882 F.2d 1493, 1498–99 (10th Cir.1989). In *Stewart*, the plaintiff's arrest, like Salmon's, occurred before the Tenth Circuit addressed directly the question whether the *Franks* standards also applied to material omissions in the affidavit. We looked, nevertheless, in *Stewart* to other circuits' decisions which preceded Salmon's arrest to determine that the law was clearly established on the proposition that the *Franks* standards cover material omissions.[9]  *See United States v.*

asked Margarito Salmon if he had "half an orange" and that Salmon said he must check; that Salmon called back and said the "oranges are dry." I R., Doc. 13 at 67.

Despite an inference of Salmon's involvement in drug trafficking that could be drawn from the foregoing exchange, on November 6, 1984, Gonzalez drafted a letter for the F.B.I. agent in charge who sent the letter to the United States Attorney in New Mexico. The letter says that on November 5, 1984, Margarito *Alvarado* talked to Carrera, who asked if Margarito had cashed a check, and was told "no"; the letter says that the same day, Carrera contacted "Margarito" and Carrera told Margarito "it's coming tomorrow," and Margarito said to let him know the moment it comes in and that he could be reached at the Phillips Station or the body shop (which the record otherwise connects to Margarito *Alvarado*). The next sentence of the letter then says Carrera asked "Margarito" if he had "half an orange"; "Margarito" said he would have to check; and then about one hour later, the letter says that Carrera called "Margarito" who told Carrera the "oranges" are dry.

This letter thus does not tie the suspect discussion of "oranges" to Margarito Salmon. Moreover, the police logs for these November 5 calls merely show that Carrera spoke to a "Margarito LNU" (last name unknown).

Margarito Salmon later testified that Carrera did "some work" on his truck and van and that he left the vehicles at his house. II R. at 26–28. This testimony creates a question of material fact as to the purpose for Carrera's only logged call to Salmon.

8. Salmon later testified that Carrera did "some work" on his truck and van and that he left the vehicles at his house. II R. at 26–28. This testimony creates a genuine question of material fact as to the purpose for Carrera's only logged call to Salmon.

9. *Stewart*, 915 F.2d at 582, relied on *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434 (10th Cir.1990). In *Morfin*, a qualified immunity case, the court was asked to decide for the first time whether the plaintiffs, teachers, had a clearly established right in 1985 to associate with a labor union other than their exclusive

*Williams,* 737 F.2d 594, 604 (7th Cir.1984) ("We acknowledge that the rationale of *Franks* applies to omissions and that several courts have permitted litigants to challenge affidavits on the ground that facts were omitted"), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Johnson,* 696 F.2d 115, 118 n. 21 (D.C.Cir.1982) ("the reasoning of *Franks* 'logically extends ... to material omissions'...." (quoting W. LaFave, *Search and Seizure* § 4.4 (Supp.1982))); *West Point–Pepperell, Inc. v. Donovan,* 689 F.2d 950, 959 (11th Cir.1982); *United States v. Martin,* 615 F.2d 318, 328 (5th Cir.1980) ("allegations of material omissions [are] to be treated essentially similarly to claims of material misstatements"). *Accord United States v. House,* 604 F.2d 1135, 1141 n. 9 (8th Cir.1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1990). Moreover, in deciding whether the law was clearly established for these purposes, the officials concerned "are required to relate established law to analogous factual settings." *Garcia By Garcia v. Miera,* 817 F.2d 650, 657 (10th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) (quoting *People of Three Mile Island v. Nuclear Regulatory Commission,* 747 F.2d 139, 144 (3d Cir. 1984)).

In *DeLoach v. Bevers,* 922 F.2d 618, 622 (10th Cir.1990), we concluded that reckless disregard for the truth occurs whenever the affiant in fact entertains serious doubts as to the truth of his allegations. Furthermore, reckless disregard for the truth can be inferred where the circumstances provide obvious reasons for doubting the truthfulness of the allegations. *Id.* On the other hand, not all errors or omissions will negate probable cause and defeat a qualified immunity defense, such as allegations grounded in negligence or innocent mistake. *Stewart,* 915 F.2d at 582–83. Nevertheless, this court has recognized that a warrant must be voided and the fruits of a search or seizure excluded " 'if

the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.' " *De-Loach,* 922 F.2d at 621 (quoting *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984)).

We agree with the trial judge that there is a genuine issue of material fact whether an "officer of reasonable competence would have requested the warrant" for Salmon's arrest with Gonzalez' information. *Malley,* 475 U.S. at 346, n. 9, 106 S.Ct. at 1099, n. 9; *See DeLoach v. Bevers,* 922 F.2d at 623; *Archer v. Sanchez,* 933 F.2d at 1526, 1531. *Cf. Zuchel v. Spinharney,* 890 F.2d 273, 275–76 (10th Cir.1989) (question of material fact concerning officer's use of excessive force precluded summary judgment premised on qualified immunity). The denial of summary judgment for Gonzalez was not error. The qualified immunity defense may be asserted, of course, at trial. *Dixon v. Richer,* 922 F.2d 1456, 1463 (10th Cir.1991).

### B.

■ Schwarz and four other agents, not including Gonzalez, executed the arrest warrant. Schwarz stated that he did not know of Margarito Alvarado until after Margarito Salmon's arrest, III R. at 18 (Schwarz' Deposition), nor that he worked at the Plainsman 66. *Id.* at 20. Schwarz also was not present when Gonzalez prepared the arrest affidavit, *id.* at 16–17; and only read the affidavit the evening prior to Schwarz' arrest of Salmon. *Id.* at 46–47. Schwarz contends that because he had no role in preparing the affidavit, and because the warrant issued by the magistrate was facially valid, his execution of the warrant is protected by the doctrine of qualified immunity. We agree.

The Supreme Court held in *Anderson* that: "it is inevitable that law enforcement officials will in some case reasonably but mistakenly conclude that probable cause is

bargaining agent. In holding that the right of such association was clearly established, the court stated: "In the absence of contemporary Tenth Circuit precedent directly concerning the

issue, we may look to the law of other circuits when deciding whether or not a right was clearly established." *Morfin,* 906 F.2d at 1439.

present, and we have indicated that in such case those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." 483 U.S. at 641, 107 S.Ct. at 3040; *see Malley*, 475 U.S. at 344–45, 106 S.Ct. at 1097–98; *United States v. Hunt*, 893 F.2d 1028, 1031–1032 (9th Cir.1990) (no Fourth Amendment violation where arresting officer relies in good faith on arrest warrant), revised as to other grounds of the opinion, *United States v. Hunt*, 925 F.2d 1181 (9th Cir.1991), *cert. pending; cf. United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984).

We feel that an objectively reasonable officer clearly could have believed that Schwarz' execution of the facially valid arrest warrant was proper here so that his conduct was protected by the defense of qualified immunity. *See Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39 (1982). Hence the denial of summary judgment for Schwarz was error and should have been granted as to the Salmon's Count I claim on the ground of qualified immunity.

## IV

Under state law, Salmon requests damages for the defendants' allegedly tortious conduct of false imprisonment (Count II), trespass (Count III), and battery (Count IV). Furthermore, his wife, Magdalena, and his son, Margarito, Jr., claim damages for negligent infliction of emotional distress (Count VI and Count VII). Gonzalez and Schwarz contend that the plaintiffs' common law tort claims must be asserted under the Federal Torts Claims Act (FTCA), if at all, and therefore, these claims should be remanded for further proceedings in the district court. 28 U.S.C.A. § 1346(b), 2401(b), 2671–80. *See* Appellants' Reply Br. at 3–4. We agree that plaintiffs' state law claims are subject to the FTCA and remand to the district court for further proceedings.

While the defendants' appeal was pending, Congress amended the FTCA by enacting the Federal Employees' Liability Reform and Tort Compensation Act of 1988, Pub.L. No. 100–694, 102 Stat. 4563 (FELRTCA). FELRTCA "appl[ies] to all claims, civil actions, and proceedings pending on, or filed after, the date of enactment," November 18, 1988 and, therefore, applies here. Pub.L. No. 100–694, § 8(b), 102 Stat. 4565; *see also* note following 28 U.S.C.A. § 2679.

As we noted in *Petrini v. Howard*, 918 F.2d 1482, 1485 (10th Cir.1990) (*per curiam* ), FELRTCA "codifies the doctrine of absolute immunity and forces persons injured by common law torts committed by federal employees within the scope of their employment to seek redress against the United States under the Federal Tort Claims Act[.]" Section 5 of FELRTCA provides that the remedy afforded by the FTCA "is exclusive of any other civil action or proceeding for money damages ... against the employee[.]" 28 U.S.C.A. § 2679(b)(1); *see also United States v. Smith*, — U.S. —, 111 S.Ct. 1180, 1185, 113 L.Ed.2d 134 (1991). Thus, plaintiffs' state law claims must proceed under the FTCA as amended by FELRTCA.[10]

FELRTCA changed the rule in *Westfall v. Erwin*, 484 U.S. 292, 300, 108 S.Ct. 580, 585, 98 L.Ed.2d 619 (1988), which had held that the judicially created doctrine of official immunity does not provide blanket protection to government employees for torts committed in the scope of their employment. *See Smith*, 111 S.Ct. at 1183 (1991). As recognized in *Smith*, FELRTCA now grants immunity to government employees acting within the scope of their employment by requiring persons injured by them

---

**10.** However, pursuant to FELRTCA's Section 5 "the FTCA is *not* the exclusive remedy for torts committed by Government employees in the scope of their employment when an injured plaintiff brings" a *Bivens* action. *Smith*, 111 S.Ct. at 1185 (emphasis in original); 28 U.S.C.A. § 2679(b)(2)(A). Accordingly, Salmon's *Bivens* claim for the violation of his Fourth Amendment rights remains unaffected by FELRTCA.

*See also Carlson v. Green*, 446 U.S. 14, 19–20, 100 S.Ct. 1468, 1471–72, 64 L.Ed.2d 15 (1980) (noting that under 28 U.S.C. § 2680(h) victims of intentional torts committed by federal law enforcement officers "shall have an action under FTCA against the United States as well as a *Bivens* action against the individual officials alleged to have infringed their constitutional rights").

to substitute the government as the defendant—"the remedy against the United States ... [being] exclusive of any other civil action or proceeding for money damages ... against the employee or the employee's estate...." *Id.* at 1183–84 and n. 3; *see* 28 U.S.C.A. § 2679(b); *Christensen v. Ward,* 916 F.2d 1462, 1475 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990).

■ Plaintiffs, challenging the applicability of the FTCA, argue that FELRTCA [11] impermissibly deprives all claimants, who are tortiously injured by a federal employee, of their Seventh Amendment [12] right to a jury trial by subjecting their claims to 28 U.S.C.A. § 1346(b).[13] Appellees' Reply Br. at 2–11. It is true that the plaintiffs' claims under FELRTCA are subject to § 1346(b) and that this section must be read in connection with 28 U.S.C.A. § 2402 (*Jury trial in actions against United States*) which provides that "[a]ny action against the United States under section 1346 shall be tried by the court without a jury...." Nevertheless, we cannot agree that such denial of trial by jury infringes Seventh Amendment rights. The denial of a jury trial under the FTCA does not run afoul of the Seventh Amendment.[14]

■ The plaintiffs argue further that the retroactive application of FELRTCA would extinguish their tort causes of action under state law against Gonzalez and Schwarz, in violation of their due process rights under the Fifth Amendment. Appellees' Reply Br. at 11–15. While we recognize that FELRTCA bars recovery on several state law tort claims against individual governmental employees acting within the scope of their duties, we do not agree that FELRTCA's retroactive application and its effect here would violate the Constitution.

Congress has enacted several statutes that preclude recovery against individual defendants by requiring the substitution of

11. As the appellees correctly note, §§ 2679(b)(1) and (d)(4), enacted as part of FELRTCA, trigger the application of § 1346(b). These sections provide:

   (b)(1) The remedy against the *United States provided by sections 1346(b)* and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is *exclusive* of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. *Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.*

      . . . .

   (d)(4) Upon certification, any action or proceeding subject to paragraph (1), (2), or (3) shall proceed in the same manner as any *action against the United States filed pursuant to section 1346(b) of this title and shall be subject to the limitations and exceptions applicable to those actions.* 28 U.S.C.A. § 2679(b)(1) & (d)(4) (emphasis added).

12. The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. Amend. VII.

13. Section 1346(b) provides:

   (b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

14. *See In re Consolidated U.S. Atmospheric Testing Litigation,* 820 F.2d 982, 992 (9th Cir.1987); *Hammond v. United States,* 786 F.2d 8, 15 (1st Cir.1986); *cf. Glidden Co. v. Zdanok,* 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962) (plurality opinion) (suits against government in the Court of Claims requiring waiver of immunity are not "suits at common law" within the meaning of the Seventh Amendment); *McElrath v. United States,* 102 U.S. 426, 440, 26 L.Ed. 189 (Oct. Term 1880) (suits against the government in the Court of Claims are not controlled by the Seventh Amendment; they are not suits at common law within its true meaning).

the United States as the party defendant. *See, e.g.,* Federal Drivers Act, 28 U.S.C.A. § 2679(b)–(e); the National Swine Flu Immunization Program, 42 U.S.C. § 247b(k)(3) & (k)(5)(A) (1976) (amended 1978); the Department of Energy National Security and Military Applications of Nuclear Energy Authorization Act of 1985, 42 U.S.C.A. § 2212. These acts have withstood constitutional challenges on due process grounds similar to those raised here. *See, e.g., In re Consolidated U.S. Atmospheric Testing Litigation,* 820 F.2d 982, 991 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988) (Nuclear Energy Authorization Act); *Hammond v. United States,* 786 F.2d 8, 13-14 (1st Cir.1986) (Nuclear Energy Authorization Act); *Carr v. United States,* 422 F.2d 1007, 1010–11 (4th Cir.1970) (Federal Drivers Act). Relying in part on these cases, both the Sixth and Eleventh Circuits, as well as two district courts, have held that FELRTCA's substitution and retroactive application provisions are constitutional. *Arbour v. Jenkins,* 903 F.2d 416, 420 (6th Cir.1990); *Sowell v. American Cyanamid Co.,* 888 F.2d 802, 805 (11th Cir.1989); *Connell v. United States,* 737 F.Supp. 61, 63 (S.D.Iowa 1990); *Binning v. Hardin,* 729 F.Supp. 637, 640–41 (S.D.Ind.1990).

We find the rationale in *Arbour* and *Sowell* persuasive that the clear language of FELRTCA mandates its application to suits pending at the time of its enactment and that FELRTCA's retroactive application is not unconstitutional because "a legal claim [for tortious injury] affords no definite or enforceable property right until reduced to final judgment." *Arbour,* 903 F.2d at 420; *Sowell,* 888 F.2d at 805. *Accord Connell,* 737 F.Supp. at 63 (distinguishing FELRTCA tort claims from vested contract or statutory rights which cannot be abridged by subsequent legislation, citing *Coombes v. Getz,* 285 U.S. 434, 439–48, 52 S.Ct. 435, 435–38, 76 L.Ed. 866 (1932)). Moreover, there are advantages afforded under the FTCA—the administrative claim procedure for more expeditious resolutions, and the liability of the government in lieu of the risk that individual defendants may be judgment proof. *Binning,* 729 F.Supp. at

641. Finally, we note that the Supreme Court, this court, and others, while not addressing due process challenges to FELRTCA, nevertheless have consistently applied FELRTCA to cases pending before the date of its enactment. *See, e.g., Smith,* —— U.S. at ——, 111 S.Ct. at 1183–85; *Petrini,* 918 F.2d at 1485 (FELRTCA is retroactive and codifies doctrine of absolute immunity); *Christensen v. Ward,* 916 F.2d 1462, 1472 (10th Cir.1990); *Lunsford v. Price,* 885 F.2d 236, 240–41 (5th Cir. 1989); *Moreno v. SBA,* 877 F.2d 715, 716–17 (8th Cir.1989); *Yalkut v. Gemignani,* 873 F.2d 31, 34 (2d Cir.1989). Thus, we reject the argument that the application of FELRTCA to cases pending on the date of its enactment constitutes retroactive legislation which violates the Fifth Amendment's Due Process Clause.

▮ Under FELRTCA, substitution of the government as the party defendant to the state law claims is required upon "certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C.A. § 2679(b)(1). Upon such certification, the substitution becomes mandatory. *Id.* at § 2679(d)(1); *Aviles v. Lutz,* 887 F.2d 1046, 1048–49 (10th Cir. 1989); *Mitchell v. Carlson,* 896 F.2d 128, 136 (5th Cir.1990); *cf. S.J. & W. Ranch Inc. v. Lehtinen,* 913 F.2d 1538, 1542–43 (11th Cir.1990), *revised as to other ruling,* 924 F.2d 1555 (11th Cir.1990) (per curiam). Moreover, "[w]here the Attorney General refuses to issue such certification, the Act permits the employee to seek a judicial determination that he was acting within the scope of his employment." *Smith,* 111 S.Ct. at 1184 n. 5 (citing § 2679(d)(3)).

In determining whether the defendants were entitled to absolute immunity from the plaintiffs' common law tort claims, the district court affirmatively found that the defendants were acting within the scope of their official duties when they arrested Salmon. *See* I R., Doc. 37, Memorandum Op. at 6–7. This determination satisfies the requirement for the Attorney General's certification of that same fact, as envi-

sioned by FELRTCA's amendment to § 2679(d). In these circumstances, we conclude that we should remand so that the district court can grant plaintiffs leave to amend their complaint, and so that the court can conduct further proceedings under the FTCA. Under FELRTCA, plaintiffs' common law claims (Counts II, III, IV, VI and VII) may only be maintained against the United States because Gonzalez and Schwarz were acting within the scope of their employment and have absolute immunity from these claims.

## V

We AFFIRM the district court's denial of summary judgment sought on immunity grounds on the Count I constitutional claim of plaintiff Margarito Salmon as to defendant Gonzalez and REVERSE the denial of summary judgment as to defendant Schwarz on Count I. As to Counts II, III, IV, VI and VII, the case is REMANDED to the district court to conduct further proceedings under FELRTCA and the FTCA in accord with this opinion.

IT IS SO ORDERED.