**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 11 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CARL KIPP OLSEN; CLAIR D. OLSEN;
DONNA R. OLSEN,

        Plaintiffs - Appellants,

    v.

LAYTON HILLS MALL; THE COPPER
RIVET; CASSI GREGG; I.P.C.
INTERNATIONAL SECURITY, a Utah
Corporation; LAYTON CITY, a Utah
municipal corporation; DAVIS COUNTY,
a body politic; BRADLEY J. KING, an
individual; STEVEN BROWN, an
individual,

        Defendants - Appellees,

No. 01-4130

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 1:99-CV-45-K)

---

David W. Brown, West Valley City, Utah, for Plaintiffs-Appellants.

Robert R. Wallace, Plant, Wallace, Christensen & Kannell, Salt Lake City, Utah, for
Defendant-Appellee Davis County; Andrew W. Morse, Snow, Christensen & Martineau
(Richard A. Vazquez with him on the brief), Salt Lake City, Utah, for Defendants-
Appellees Layton City and Bradley J. King.

---

Before **HARTZ**, **ALDISERT**[*] and **PORFILIO**, Circuit Judges.

_____

**ALDISERT**, Circuit Judge.

_____

This appeal by Carl Kipp Olsen from summary judgments in favor of Appellees Officer Bradley J. King, Layton City and Davis County requires us to examine whether the district court properly shielded a police officer and two municipalities from an obsessive-compulsive disorder sufferer's 42 U.S.C. § 1983 claims. More specifically, we must determine whether the district court erred in: 1) granting summary judgment on the basis of qualified immunity to Appellee Officer King on Appellant's Fourth Amendment unlawful arrest and excessive force claims; and 2) granting summary judgment on the basis of qualified immunity to Officer King on Appellant's Eighth Amendment claim for deliberate indifference to a serious medical need — namely, a panic attack sparked by his obsessive-compulsive disorder ("OCD"). Additionally, we must decide whether the district court correctly granted summary judgment to Appellee Layton City based on the absence of an underlying constitutional violation, and to Appellee Davis County based on the absence of an unconstitutional policy regarding a failure to train on, or the deliberate indifference, to Appellant's OCD.

_____

[*] Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

The district court had jurisdiction of the underlying action pursuant to 28 U.S.C. §§ 1331 and 1343. The appeal was timely under Rule 4, Federal Rules of Appellate Procedure. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## I.

## A.

Carl Kipp Olsen took his two teenage sons shopping at Layton Hills Mall on December 7, 1997. At the Copper Rivet apparel store, Appellant tried to charge $114.46 worth of items with his Guitar City corporate Visa credit card. Because Copper Rivet's electronic card reader could not process the card, store clerk Cassie Gregg manually entered the card's data. After punching in the account number correctly, Gregg had inadvertently entered the wrong expiration date. Although the Visa card was valid and had not expired, the computer reader nonetheless declined it because of the clerk's typing error — the reason for rejection unbeknownst to either the Appellant or the clerk at the time of the attempted transaction.

Appellant then tried to charge the items with a Discover Card credit card bearing the name of his father Clair Olsen, who had previously authorized him to use the card. Appellant was unaware that his mother Donna Olsen had asked for a new card to be issued because of prior billing concerns. The clerk called Discover Card directly to authorize the account, but Discover Card informed her that Appellant was using the card fraudulently and that she should confiscate it. After Donna Olsen had complained about

several unauthorized charges in 1996, Discover Card had in fact improperly listed the account as "fraudulent" without notifying or obtaining her or Clair Olsen's consent. Instead of retaining the Discover card, the clerk returned it to Appellant, who advised her that he would return with a personal check to pay for the purchases.

While Appellant was en route from the Layton Hills Mall to his home and back again, the Copper Rivet clerk contacted mall security about Appellant's attempted fraudulent credit card use. Mall security asked the clerk to notify them if Appellant returned to the store. About 30 minutes later, Appellant and his two sons indeed came back to the Copper Rivet, and Appellant paid for the items with a personal check. The store clerk nonetheless contacted mall security during the transaction. When Appellant tried to leave the mall with his merchandise and a receipt, mall security guards stopped him for allegedly using a fraudulent Discover card and held him without incident until the police arrived.

Layton City Police Officer Bradley King responded to the call. Upon arriving on the scene, Officer King spoke to mall security guard Cindy Tanner, who told him that Appellant tried to use fraudulently the Discover card at the Copper Rivet. Officer King asked that Appellant turn over the credit card. Protesting that he had done nothing wrong, Appellant initially refused but ultimately complied. He also demanded to see Officer King's supervisor. Without conducting an investigation of his own, Officer King placed Appellant under arrest based on the information that he had gathered. Appellant

was charged with fraudulent use of a financial transaction card, possession of a stolen card, and interference with an arresting officer. Notably, Officer King tacked on this last charge immediately before he effectuated the arrest.

Officer King then attempted to handcuff Appellant, whose "muscles automatically tensed up" at the physical confrontation. Supplemental Appendix at 2. Although Officer King claims that he merely "maneuvered [Appellant] against a storefront window [to] gain[] the necessary leverage to handcuff him," App. at 216, Appellant contrarily contends that Officer King used excessive force when he shoved Appellant "a good 10, 12 feet," "slamm[ing him] up against the glass" of a store window. Id. at 173. Appellant also alleges that Officer King then pulled his arm behind his back in an awkward position in order to handcuff him, threatening to "take [him] to the ground" if he resisted. Id. at 172. Appellant claims that he never physically resisted during the exchange. Id. at 172-173.

Having successfully handcuffed Appellant, Officer King publicly led him through the mall to the Copper Rivet, where Officer King questioned Cassie Gregg about Appellant's use of the Discover card. At the store, Officer King also telephoned the Discover Card office and spoke to Heidi Crocker, who told him that their records listed the card as stolen. Appellant repeatedly asked Officer King to telephone his parents in Bullhead City, Arizona, to verify that the card was not fraudulent. Officer King refused to try to contact them, reasoning that he would be unable to determine whether the voices

on the other end of the line were indeed Appellant's parents. Officer King did not inquire whether Appellant had paid for or received the Copper Rivet items.

Officer King brought Appellant to his squad car to take him to the Farmington City (Davis County) Jail. Appellant, who suffers from a medically diagnosed condition of obsessive-compulsive disorder ("OCD"), alleges that he had a panic attack en route to the jail and informed Officer King, but that King neglected to address Appellant's two pleas for assistance. App. at 176. Officer King could not recall whether Appellant mentioned anything about a panic attack. App. at 218.

Once at the Davis County facility, Appellant indicated on a medical screening sheet and told prebooking officers that he had OCD and required medication to stave off panic attacks. App. at 268. Prebooking officers erroneously noted on the sheet that he suffered from "CDC." Id. Davis County jail officers took Appellant's medication from him and insisted — per search procedure — that he remove his shoes and socks. Appellant recoiled at the request, refusing because of a fear of contamination from the dirty floor. Ultimately, Appellant acceded to the demand, but incurred another panic attack in the process. Id. at 178, 280. The prebooking officers also forced Appellant to be fingerprinted without heeding his concerns about cleanliness. Neither Layton City nor Davis County provides any training for handling individuals diagnosed with OCD. Id. at 275, 361-364. Davis County booking procedures incorporate an intake screening procedure for undefined mental illness or "psychiatric disorders," Id. at 361-364, but

- 6 -

allow "health trained correctional deputies" to use their discretion in dealing with sundry "mental disorders." Id. at 283.

While Appellant was in custody, his parents called the jail to advise the officers about his OCD condition and the possibility of attacks. Learning that the officers had ignored Appellant's requests for aid and withheld medication from him, the Olsens called Discover Card to resolve the matter. Discover Card informed the Olsens that the company did not know of any fraudulent activity and that no holds had been placed on the card. Officer King's supervisor, Officer Steven Brown, learned the same information when he finally called Discover Card himself. Appellant posted a $2,950 bond and bailed out of jail immediately before the charges had been dropped.

**B.**

Alleging violations of their Fourth and Eighth Amendment rights, Appellant and his parents filed suit under 42 U.S.C. § 1983 in the district court against Defendants Layton Hills Mall; The Copper Rivet, Inc.; Novus Corp./Discover Card; Cassie Gregg; I.P.C. International Security Corporation; Davis County; Layton City; and Layton City police officers Bradley King and Steven Brown. All Defendants filed Motions for Summary Judgment. Appellant and his parents settled with Novus Corp./Discover Card. The district court granted the remaining Defendants' Motions for Summary Judgment on June 4, 2001. Appellant and his parents filed Motions for Reconsideration on June 14, 2001, and June 25, 2001 — both of which the district court denied on June 29, 2001.

Meanwhile, Appellant and his parents filed a timely pro se Notice of Appeal on June 26, 2001. Appellant pursues the appeal without his parents, and he brings it only against Officer King, Layton City and Davis County.

**C.**

Appellant contends that the district court erred in granting summary judgment to Officer King based on qualified immunity because the record is replete with unresolved issues of material fact pertaining to the immunity analysis. He also argues that the district court improperly granted summary judgment to Layton City because Appellant may well convince a jury that Officer King's conduct was the predicate act underpinning a constitutional claim against the municipality for a failure to properly train police officers. Finally, Appellant contends that summary judgment in favor of Davis County was improper because a jury must decide whether the absence of procedures relating to OCD sufferers may amount to a deliberate indifference to a serious medical need.

**II.**

This court reviews the legal issues surrounding the grant of summary judgment based on qualified immunity de novo, considering all evidence in the light most favorable to the nonmoving parties under Rule 56(c), Federal Rules of Civil Procedure. DeSpain v. Uphoff, 264 F.3d 965, 971 (10th Cir. 2001). Summary judgment is ultimately appropriate when there is "no genuine issue as to any material fact and . . . the moving party is

entitled to judgment as a matter of law." Oliver v. Woods, 209 F.3d 1179, 1184 (10th Cir. 2000).

This court, however, "review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions" because of the purposes behind qualified immunity. Holland v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001). When a § 1983 defendant raises the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff to show that 1) the official violated a constitutional or statutory right; and 2) the constitutional or statutory right was clearly established when the alleged violation occurred. Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, we must subsequently ask "whether the right was clearly established." Id. If the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity. Gross v. Pirtle, 245 F.3d 1151, 1156 (10th Cir. 2001). If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must prove that "no genuine issues of material fact" exist and that the defendant "is entitled to judgment as a matter of law." Id. In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense.

Farmer, 288 F.3d at 1259. When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be "properly denied." Salmon v. Schwarz, 948 F.2d 1131, 1136 (10th Cir. 1991) (applying the qualified immunity analysis in the context of a closely related Bivens action, in which material facts relating to the violation of a constitutional right were in dispute at the summary judgment stage).

**III.**

**A.**

A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause. Tenn. v. Garner, 471 U.S. 1, 7 (1985). In the context of a warrantless arrest in a § 1983 action, this court must grant a police officer qualified immunity "if a reasonable officer could have believed that probable cause existed to arrest the plaintiff." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Id. (quoting Jones v. City & County of Denver, 854 F.2d 1206, 1210 (10th Cir. 1988)). Although the court may determine whether probable cause existed at the time of the arrest by taking into account factors such as whether the officer reasonably interviewed witnesses readily available at

the scene, whether he investigated basic evidence or whether he inquired if a crime had been committed at all before invoking the power of warrantless arrest and detention, none of these factors is dispositive or indeed necessary to the inquiry. The primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the "information possessed by the [arresting] offic[er]." Id. (quoting Anderson v. Creighton, 483 U.S.635, 643 (1987)). When there are unresolved disputes of historical fact relevant to whether the officer had probable cause and to what information he possessed — and thus to whether he may properly claim qualified immunity, a court may not grant summary judgment based on qualified immunity because the officer would not have shown that no genuine dispute exists as to material fact. Farmer, 288 F.3d at 1259.

A decade-old case makes plain that we will not grant a defendant official qualified immunity if material facts are in dispute. In Salmon v. Schwarz, 948 F.2d 1131 (10th Cir. 1991), we confronted an assertion of qualified immunity by an FBI agent arising out of a Bivens action. FBI Special Agent Arturo Gonzalez applied for a warrant for the arrest of Margarito Salmon, an alleged narcotics trafficker, based on a set of intercepted phone calls to a "Margarito" whose last name was unknown in a complex scenario involving two different "Margaritos." Id. at 1139. Because "the facts . . ., considered collectively, present[ed] an incomplete picture of the circumstances relevant as to whether probable

cause existed for Salmon's arrest," we denied the agent's motion for summary judgment on qualified immunity grounds. Id. at 1137.

Although "deny[ing] summary judgment any time a material issue of fact remains on [a Fourth Amendment] claim . . . could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment,'" Saucier, 533 U.S. at 202 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)), the case before us is not one in which Appellant asserts that the sun rises in the west and demands a jury trial to resolve the issue. It is Officer King's submission that he based his probable cause determination on information obtained from a mall security guard and from his call to Discover Card before he effectuated an arrest. Appellant tells a different story. He testifies that Officer King arrested him as soon as he handcuffed him — that is, before he made any reasonable investigation into whether Appellant had fraudulently used the card. Indeed, Officer King concedes that he spoke to mall security guards and that he "decided to take [Appellant] into custody so [he] could investigate [the allegations] further and get a hold of the credit card." App. at 214. Appellant asserts that Officer King did not even ask him if he had in fact paid for the merchandise or had a receipt. Officer King says that he does not recall even seeing the merchandise, much less asking about the end result. Appellant contends that Officer King could have ended (or, more appropriately, begun) the inquiry with a call to Appellant's parents in Bullhead City; Officer King says that his conversations with the

mall security guard and the Discover Card representative gave him all the information he reasonably needed to arrest Appellant.

The bottom line is that the district court failed to take into account several disputed factual issues in granting summary judgment on the basis of qualified immunity to Officer King on Appellant's two Fourth Amendment claims. The parties do not even agree on when the arrest took place — before or after King spoke to the store clerk. The court ignored significant factual differences that render it impossible to make an initial determination as to whether Officer King violated Appellant's constitutional right to be free from unreasonable seizure. Because we believe that a jury must resolve disputed facts, the court erred in granting judgment on qualified immunity grounds as to the unlawful arrest claim.

**B.**

A police officer violates an arrestee's clearly established Fourth Amendment right to be free of excessive force during an arrest if the officer's arresting actions were not "'objectively reasonable' in light of the facts and circumstances confronting [him]." Graham v. Connor, 490 U.S. 386, 397 (1989); Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir. 2001). This court assesses the reasonableness of an officer's conduct "from the perspective of a reasonable officer on the scene," acknowledging that the officer may be "forced to make split-second judgments" in certain difficult circumstances. Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001) (quoting Graham, 490 U.S. at

396-397). This reasonableness standard — which is "clearly established" for the purposes of § 1983 actions, Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995) — implores the court to consider factors including the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest. Medina, 252 F.3d at 1131. Because the reasonableness inquiry overlaps with the qualified immunity analysis, "a qualified immunity defense [is] of less value when raised in defense of an excessive force claim." Id. (citing Quezada v. County of Bernalillo, 944 F.2d 710, 718 (10th Cir. 1991). Whether an officer acted reasonably in using deadly force is "heavily fact dependent." Romero v. Board of County Comm'rs, 60 F.3d 702, 705 n.5 (10th Cir. 1995) (quoting Wilson, 52 F.3d at 1553).

Consequently, this court will not approve summary judgment in excessive force cases — based on qualified immunity or otherwise — if the moving party has not quieted all disputed issues of material fact. Allen v. Muskogee, 119 F.3d 837, 840-842 (10th Cir. 1997). In Zuchel v. Spinharney, 890 F.2d 273 (10th Cir. 1989), we agreed that a district court could not justifiably pin a grant of summary judgment on qualified immunity while disputed material facts remained as to whether an officer behaved in an "objectively reasonable" fashion in shooting and killing a man. Specifically, we affirmed the district court's denial of a police officer's motion for summary judgment on the basis of qualified immunity in a § 1983 action involving excessive deadly force. After concluding that the

- 14 -

victim's right to be free from excessive force was a clearly established right, like the Fourth Amendment right to be free from unreasonable seizures, we held that summary judgment on the basis of qualified immunity was improper because, viewing the facts in the light most favorable to the non-moving party, "genuine issues of material fact preclud[ed] a judicial determination of whether [the officer's] conduct was objectively reasonable." Id. at 275. A qualified immunity defense will not succeed in inducing a court to grant summary judgment when "the facts . . ., considered collectively, present an incomplete picture of the [relevant] circumstances." Salmon, 948 F.2d at 1137.

We have held that summary judgment motions may not be granted on any excessive force claims under § 1983 for which *any* genuine issue of material fact remains — regardless of whether the potential grant would arise from qualified immunity or from a showing that the officer merely had not committed a constitutional violation. Muskogee, 119 F.3d at 839. In Muskogee, police officers killed a man when he refused to drop his gun while threatening to commit suicide. Although eyewitness accounts differed dramatically as to the officers' actions prior to their shooting, the district court nonetheless granted summary judgment on the ground that the officers had not committed a constitutional violation. In reversing, we held that such material factual disputes involving the "immediate connect[ion]" of an officer's use of force in response to "a suspect's threat of force" prevent a court from granting summary judgment. Id. at 840. Where a disputed issue of material fact remains, that ends the matter for summary

judgment. The court may not move on to determine whether an officer's actions were "objectively reasonable."

On the issue of excessive force, neither party's asserted material facts jibe with those of the other. Officer King says that Appellant behaved belligerently before he attempted to handcuff him. Appellant and his children say that Appellant did nothing but cooperate passively. Officer King contends that Appellant tried to resist the arrest by "turn[ing] in to me, which just made me hold on to the control hold." App. at 216. Appellant maintains that he complied physically at all times. App. at 215. Appellant says that Officer King pushed Appellant at least 10 feet into a store window to effectuate the arrest. Officer King tells a far more subdued tale of "maneuver[ing] [Appellant] against a storefront window [to] gain[] the necessary leverage to handcuff him." Supp. App. at 2. Officer King mentions nothing about manhandling Appellant during the arrest process. Appellant asserts that Officer King "cocked [his arm] at an angle, . . . clear up the middle of [his] back." App. at 172-173. Although the district court erred in granting summary judgment via qualified immunity, the overwhelming number of factual divergences scream the obvious — that material disputed facts obviously remain as to the excessive force claim. The court erred in granting summary judgment on the excessive force issue..

## IV.

A plaintiff states a cognizable Eighth Amendment claim for denial of medical attention if he "allege[s] acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). The right to custodial medical care is clearly established. Id. at 104. Although "[p]retrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, . . . this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir. 1999). "Deliberate indifference" involves both an objective and a subjective component. Sealock v. Colo., 218 F.3d 1205, 1209 (10th Cir. 2000). The former is met if the deprivation is "sufficiently serious" — that is, "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999). The latter is satisfied if an officer "knows of and disregards an excessive risk to [a detainee's] health or safety." Sealock, 218 F.3d at 1209 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Essentially, the officer must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Garrett v. Stratman, 254 F.3d 946, 949-950 (10th Cir. 2001) (quoting Farmer, 511 U.S. at 837.).

Where disputed material facts implicate either of the two questions of whether a serious medical need existed or whether an officer was deliberately indifferent to it, a court may not grant summary judgment. LeMaster, 172 F.3d at 764. In LeMaster, we reversed a district court's grant of summary judgment on an inmate's Eighth Amendment

- 17 -

claim in a case in which "material issues of fact remain[ed] concerning [1)] how badly appellant was hurt"; 2) whether a sheriff was "aware of facts from which an inference could be drawn that a substantial risk of medical harm existed[,]" and 3) whether he drew that inference. Id. Similarly, in DeSpain v. Uphoff, 264 F.3d 965 (10th Cir. 1999), we reversed a district court's grant of summary judgment where "[n]early every material fact relating to [whether the impact of a prison flooding incident constituted a 'sufficiently serious' medical need such that it would warrant attention and whether prison officials were deliberately indifferent to it] was hotly contested." Id. at 972.

Accordingly, we must only inquire whether a genuine issue of material fact existed as to either the objective or subjective inquiry that would nullify a motion for summary judgment.

## A.

As to the objective inquiry of whether Appellant's OCD-induced panic attack during the ride to jail was "sufficiently serious," Appellees downplay OCD by comparing it in gravity and prevalence to mere "sexual addiction" — held by the Court in Riddle v. Mondragon not to rise to the level of "sufficiently serious." 83 F.3d 1197, 1204 (10th Cir. 1996); Appellee Officer King's Brief at 33.

Appellant had been diagnosed with and treated for OCD over a period of at least 15 years before the December 1997 incident. App. at 165-166, 183, 292. Moreover, OCD does not reside in the minds of a handful of unlucky sufferers; Appellant's very

real, diagnosed affliction greatly outweighs the "[v]ague allegations of eroded self-esteem, apathy, fear and feelings of differentness" that did not satisfy Estelle's objective prong in Riddle. 83 F.3d at 1204.

According to the National Institute of Mental Health, OCD impacts more than two percent of the population — outpacing both schizophrenia and bipolar disorder in terms of frequency of affliction. National Institute of Mental Health, Obsessive-Compulsive Disorder, at http://www.nimh.nih.gov/publicat/ocd.cfm (last visited Oct. 9, 2002). See also 3 AMERICAN PSYCHIATRIC ASSOCIATION, TREATMENTS OF PSYCHIATRIC DISORDERS 2097 (1989) (reporting that, as early as 1984, "[t]he lifetime prevalence of OCD in the general population [was] more than two percent"). Seeping into mainstream consciousness, the disorder profoundly affected a successful writer in the 1997 Academy Award nominated film As Good As It Gets, and the popular cable television show Monk revolves around a detective who suffers from OCD. AS GOOD AS IT GETS (Gracie Films 1997); MONK (USA Network, Inc. 2002). Although our task is not to determine whether Appellant's OCD is "sufficiently serious," it is hardly inconceivable that a jury could find precisely that. Accordingly, the objective portion teeters on a disputed material fact that makes it wholly improper for the district court to have granted summary judgment.

**B.**

Assuming, arguendo, that OCD indeed qualifies as "sufficiently serious," the subjective second prong also teems with disputed material facts that render summary

- 19 -

judgment inappropriate at this stage. With regard to whether Officer King "kn[ew] of and disregard[ed] an excessive risk to [Appellant's] health or safety," Sealock, 218 F.3d at 1209 (quoting Farmer, 511 U.S. at 837), neither party agrees on the material fact of whether Officer King even knew of Appellant's condition — much less on whether he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed, or on whether he] dr[e]w the inference." Garrett, 254 F.3d at 949-950 (quoting Farmer, 511 U.S. at 837). Appellant claims that he incurred a OCD-related panic attack on the ride to the jail and that he twice told Officer King about the attack, only to receive no response. App. at 176. Officer King could not recall whether Appellant mentioned anything about a panic attack, though he did "believe that [Appellant] stated something to the fact that he'd had [health] problems in the past." App. at 218.

According to the fourth edition of The Diagnostic and Statistical Manual of Mental Disorders-IV — a definitive source for the classification of mental illnesses — the essential features of the disorder are "obsessions or compulsions cause marked distress, are time consuming . . ., or significantly interfere with the person's normal routine, occupational (or academic) functioning, or usual social activities or relationships." AMERICAN PSYCHIATRIC ASSOCIATION, THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.3 (4th ed. 1994) [hereinafter DSM-IV]. Obsessions are "recurrent and persistent thoughts, impulses, or images that are experienced, at some time

during the disturbance, as intrusive and inappropriate and that cause marked anxiety or distress." Id. Compulsions are "repetitive behaviors (e.g., hand washing, ordering, checking) or mental acts (e.g., praying, counting, repeating words silently) that the person feels driven to perform in response to an obsession, or according to rules that must be applied rigidly." Id.

When the OCD sufferer attempts to stave off a compulsion, "there is a sense of mounting tension . . . ." AMERICAN PSYCHIATRIC ASSOCIATION, THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.3 (3d rev. ed. 1987). Moreover, anxiety is a common feature associated with the disorder. Id. Thus, OCD does not manifest itself as visibly as a bloody nose; rather, like a heart attack victim who remains on his feet, its characteristics are subtler and consequently more capable of being described by the sufferer than noticed by an outsider.

Although the simple act of placing an innocent man — as was the case here — in a police car may unquestionably produce anxiety, Appellant's allegation that he twice told Officer King that he was having a panic attack, coupled with Officer King's admission that Appellant mentioned prior health problems, together signify that Officer King may have known of — and disregarded — an excessive risk to Appellant's health. This is for a jury to decide. Just as our task is not to determine whether Appellant's alleged OCD and panic attacks rose to the level of "sufficiently serious," our task is not to decide whether Officer King was indeed ignorant to Appellant's apparent pleas for assistance.

As in LeMaster, the point is that "material issues of fact remain concerning" whether Officer King was "aware of facts from which an inference could be drawn that a substantial risk of medical harm existed" and whether he drew that inference. LeMaster, 172 F.3d at 764. Strongly contradictory factual assertions as to the nature of OCD and as to Officer King's response to Appellant's pleas make summary judgment improper on Appellant's Eighth Amendment claim.

## V.

We will not hold a municipality "liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993). When an officer deprives a citizen of a constitutional right, however, municipal governments may incur liability under § 1983 when "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Social Services, 436 U.S. 658, 690 (1978). Because vicarious liability will not open a municipality to liability simply when one of its officers has committed a constitutional violation, Monell, 436 U.S. at 694, "[i]t is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." City of Canton v. Harris, 489 U.S. 378, 385 (1989) (internal citation omitted). In the absence of an explicit policy or an entrenched custom, "the inadequacy of police training may serve as a basis of § 1983

liability . . . where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." Id.

Indeed, we have confirmed that this deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1999). Although a single incident generally will not give rise to liability, Okla. City v. Tuttle, 471 U.S. 808, 823 (1985), "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." Barney, 143 F.3d at 1307 (internal citations omitted). The official position must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a "direct causal link" between the action and the right violation. Bd. of County Comm'rs v. Brown, 520 U.S. 397, 399 (1997). That is, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" City of Canton, 489 U.S. at 391. With regard to any attempted showing of "deliberate indifference" by a municipality, the existence of "material issues of material fact preclude[s] summary judgment." Cruz v. City of Laramie, 239 F.3d 1183, 1191 (10th Cir. 2001).

**A.**

Because Appellant has failed to allege facts showing that Layton City manifested deliberate indifference to the rights of OCD sufferers who are taken into custody, we will affirm the district court's grant of summary judgment to Layton City. Although Appellant may indeed show that Officer King has committed the prerequisite underlying Eighth Amendment violation, Appellant has not taken the subsequent step of linking the possible violation to a municipality custom or policy. The teachings of Monell and its progeny proscribe the attachment of vicarious liability to a municipality merely because the municipality employed the individual who committed a constitutional violation. It is absolutely necessary to show that "the 'execution of the government's policy or custom . . . inflict[ed] the injury' [in order to hold a] municipality . . . liable under § 1983." City of Canton, 489 U.S. at 385 (internal citation omitted). With regard to Layton City, Appellant has alleged nothing more than that Officer King committed a constitutional violation. Appellant has not adequately tied the violation to a broader municipality custom — that is, deliberate indifference to OCD in the Layton City police department's mental health training scheme. We may not infer from Appellant's otherwise respectable assertion of the frequency of OCD that the municipality "ha[d] actual or constructive notice that its action or failure [was] substantially certain to result in a constitutional violation, and [they] consciously and deliberately [chose] to disregard the risk of harm." Barney, 143 F.3d at 1307. Because Appellant has not alleged facts bridging the

- 24 -

individual violation to a broader municipal custom, no genuine issue of material fact sits in dispute because none has been raised on this claim. Accordingly, we affirm the district court's decision to grant summary judgment to Layton City.

**B.**

Davis County, however, is quite a different story. We reverse the district court's grant of summary judgment to Davis County because Appellant has alleged the necessary facts that may establish that Davis County manifested deliberate indifference by failing to train its jail's prebooking officers to recognize OCD and handle sufferers appropriately. "[T]he inadequacy of police training [with respect to OCD] may serve as a basis of § 1983 liability . . . where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 385. If "the [Davis County] ha[d] actual or constructive notice that its action or failure [was] substantially certain to result in a constitutional violation, and it consciously and deliberately ch[ose] to disregard the risk of harm," Barney, 143 F.3d at 1307, Appellant could make out a showing of deliberate indifference — more than sufficient to quash a summary judgment motion.

Appellant has alleged facts showing that prebooking officers receive absolutely no training on OCD. They look only "for inmates that have a complete change of behavior . . . odd behaviors, aggressive behaviors, suicidal indicators." Id. If a prebooking officer is unsure how to address an inmate who complains of a panic attack,

he or she must refer to a policy manual. App. at 279. The prebooking officers' field of mental health knowledge is contained in the manual on booking procedures that indeed addresses mental health needs and delineates an initial screening process. App. at 362-364. The prebooking officers, however, are left with discretion in determining whether an inmate suffers from a psychological disorder requiring medical attention. Significantly, no discussion of OCD appears within it.

It hardly bears repeating, but OCD does not rival Halley's Comet in its infrequency of appearance. OCD occurs in more than two percent of the population, causing "marked distress [and] significant interferenc[ence] with the person's normal routine . . . ." <u>Supra Part IV</u> (citations omitted). Although a jury shall decide exactly to what extent it has burst into the mainstream, one could hardly deem it an obscure disorder.

At the jail, Appellant reported his OCD for the standard medical screening sheet; it appeared as "CDC." Besides the facts that Appellant also disclosed his panic attack syndrome, a prebooking officer "seems" to recall Appellant's having asked for his medication because he was having a panic attack. App. at. 280. The prebooking officers, however, took away Appellant's medication, even after he informed them that he required it.

Given the frequency of the disorder, Davis County's scant procedures on dealing with mental illness and the prebooking officers' apparent ignorance to his requests for medication, a violation of federal rights is quite possibly a "'plainly obvious'

consequence" of Davis County's failure to train its prebooking officers to address the symptoms. Barney, 143 F.3d at 1307 (internal citations omitted). And this is for a jury to decide. That OCD is relatively common and that the county had procedures in place for dealing with inmates with psychiatric disorders suggest that the municipality may have had constructive notice of the illness' prevalence and consequences. Accordingly, Appellant has raised a genuine issue of material fact as to whether the county had notice of and was deliberately indifferent in its failure to train prebooking officers on OCD.

## C.

Moreover, the parties are at loggerheads over whether Appellant even suffered an injury directly resulting from the alleged deliberate indifference. Although Davis County contends that its prebooking officers' actions in no way could have sparked an injury or the recurrence of OCD, Appellant argues that forcing him to remove his footwear without regard for his condition or need for medication triggered the onset of the disorder. Davis County asserts that prebooking officers noticed nothing so out of the ordinary as to warrant medical attention or a variance from routine policy. Appellant alleges that they cavalierly ignored his pleas and his condition. This conflict gives rise to another disputed issue of material fact. Deliberate indifference in this case is a question for the jury.

In sum, we conclude that disputed material facts exist as to whether Davis County expressed deliberate indifference to an OCD-sufferer's rights via a failure to train and

whether any deliberate indifference could operate as a causal link to his alleged injuries. We reverse the grant of summary judgment to Davis County.

* * * * *

For the foregoing reasons, we REVERSE the grant of summary judgment in favor of Officer King and Davis County. We AFFIRM summary judgment in favor of Layton City.

No 01-4130 - <u>Olsen v. Layton Hills Mall</u>

**HARTZ,** Circuit Judge, concurring in part and dissenting in part:


I concur in the affirmance of the summary judgment in favor of Layton City. I also agree that we must set aside the summary judgment in favor of Officer King on Mr. Olsen's Fourth Amendment excessive-force claim. I respectfully dissent, however, from the majority's view that Olsen is entitled to pursue his Eighth Amendment/Due Process claim against King and Davis County. I will first address the Fourth Amendment claim and then the Eighth Amendment claim. (To be precise, both claims are under the Fourteenth Amendment, which imposes on the states the substance of the Fourth and Eighth Amendments. *See Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433-34 (2001) (Eighth Amendment is incorporated into Fourteenth Amendment); *Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949) (incorporating Fourth Amendment into Fourteenth Amendment).)

**I. Fourth Amendment Claim**

I agree that Mr. Olsen's testimony raises a genuine issue of material fact regarding whether Officer King used excessive force during Olsen's detention. If the jury believes Olsen's account of being thrown against the store window, despite his having offered no resistance to King, it could reasonably find that King violated Olsen's Fourth Amendment rights by using excessive force.

The majority opinion, however, appears to go further in finding additional possible Fourth Amendment violations by King. To the extent that it does, I disagree. Because I am not sure precisely what is the majority opinion's view of the pertinent law, I shall set forth my own analysis, without attempting to compare it to the majority's.

The starting point is to determine what legal basis, if any, King had to detain Olsen. The core charge against Olsen was fraudulent use of a credit card under Utah Code Ann. § 76-6-506.2. The statute makes it a crime for a person "knowingly, with intent to defraud, [to] obtain or attempt to obtain credit[,] or purchase *or attempt to purchase* goods, property, or services, by the use of a false, fictitious, altered, counterfeit, revoked, expired, stolen, or fraudulently obtained financial transaction card." (emphasis added.) Because the statute prohibits a mere attempt, it does not matter whether Olsen actually obtained any merchandise or eventually paid for any merchandise that was obtained.

In my view, King had probable cause to arrest Olsen for the credit card offense when the mall security guard informed him of what had happened when Olsen tried to use the credit card. After all, Olsen had attempted to buy merchandise with a card that Discover Card had reported to be fraudulent. (In fact, he had attempted to use the Discover Card immediately after his Visa Card had been rejected. The rejection may have resulted from an error by the store clerk in entering the card's expiration date, but this error was not known at the time. *Cf. United States v. Shareef*, 100 F.3d 1491, 1505

-2-

(10th Cir. 1996) ("A mistaken premise can furnish grounds for a *Terry* [*v. Ohio*, 392 U.S. 1 (1968),] stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." (internal quotation marks omitted)).)

Even though the information received by King was double hearsay, an officer can rely on such information if each level of hearsay was itself reliable. *See United States v. McCoy*, 478 F.2d 176, 179 (10th Cir. 1973). Here, both levels of hearsay were reliable. The initial report was by the store clerk, an identified citizen with no apparent axe to grind. *See United States v. Neff*, 300 F.3d 1217, 1221 (10th Cir. 2002) (discussing presumptive reliability of citizen informants). And the security officer was herself a reliable source. *See Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986) ("Police have reasonable grounds to believe a guard at a supermarket."). Not only did the security officer have no apparent reason to lie, she had a strong motive to be restrained in accusing a customer of crime—both because of her employer's desire to keep customers and because of the potential liability to the security officer and her employer if the store's detention of the customer was unfounded. *See id.*

Of course, it is good police practice to ask the suspect for an explanation of apparently criminal conduct. But the arresting officer has no obligation to believe the suspect, *see Romero v. Fay*, 45 F.3d 1472, 1474 (10th Cir. 1995) (officer lawfully kept suspect in custody despite suspect's protestations of innocence), and failure to inquire does not void the officer's probable cause, *see id.* at 1477-78 (once officer had probable

cause to arrest, his failure to investigate further did not negate probable cause finding, absent showing that initial determination was itself unreasonable); *See generally* Wayne R. LaFave et al., 2 Search and Seizure § 3.2(d) at 47-49 (2d ed. 1996).

If I am correct that King had probable cause to arrest Olsen upon receiving the security officer's report, then King could lawfully handcuff Olsen and take him to the store clerk for further investigation. The sole possible Fourth Amendment violation (although hardly a trivial one) would be the use of excessive force in throwing Olsen against the store window.

Yet even if I am incorrect about the existence of probable cause, the report from the security officer unquestionably gave King reasonable suspicion to detain Olsen for further investigation. We thus may examine the constitutionality of King's conduct on the assumption that he lacked probable cause but had reasonable suspicion. In this regard, it is important to recognize that it is irrelevant whether King thought he had probable cause to arrest or whether he thought he was effecting an arrest. The issue is whether King had sufficient information to justify what he did with the suspect. As a leading authority states:

> The police conduct should be judged in terms of what was done rather than what the officer involved may have called it at the time. If an officer tells the suspect he is under arrest but then conducts only a frisk and finds a weapon, a later determination that grounds for arrest were lacking should not render inadmissible the discovered weapon if there were in fact grounds for a stop and the frisk. Obviously the result would be otherwise if the search exceeded that permissible under *Terry*.

-4-

Wayne R. LaFave et al., 2 Criminal Procedure § 3.8(b) (2d ed.1999); *see Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) ("Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken.") (internal citation and quotation marks omitted); *Neff*, 300 F.3d at 1222 ("In measuring the actions of a police officer under the Fourth Amendment, . . . we look at the objective facts, not the officer's state of mind."). *But cf.* George Dix, *Nonarrest, Investigatory Detention in Search and Seizure Law*, 1985 Duke L.J. 849, 922 (1985) (whether officer announces that suspect is under arrest may be relevant to "the intrusiveness experienced by a detainee").

Given reasonable suspicion to believe Olsen had committed a crime, King had the right to detain Olsen for a reasonable time to investigate the matter. It was appropriate for King to follow up on the security officer's report by questioning the store clerk and calling Discover Card, and it was certainly lawful for King to continue to detain Olsen during this limited period of time.

Of course, King could not employ excessive force during the detention. If a jury believed Olsen's account, it could properly find that King violated Olsen's Fourth Amendment rights by throwing him against a store window.

In addition, if King had only reasonable suspicion, but not probable cause, then the use of handcuffs may have constituted excessive force for the investigative detention. The

use of handcuffs is not a per se violation of the rights of a person being detained for investigation based on reasonable suspicion. *Neff*, 300 F.3d at 1220 ("[A] *Terry* stop does not become unreasonable just because police officers use handcuffs . . . ."). Nevertheless, unlike when there is probable cause for an arrest, there must be justification for their use, such as specific reason to fear violence or escape. *See id.* at 1220-21.

If the handcuffing of Olsen was improper in this case, he would have a cause of action under the Fourth Amendment for such use of excessive force. That violation, however, would not vitiate the lawfulness of extending the investigative detention to enable King to interview the store clerk and call Discover Card. (The handcuffing could also affect the lawfulness of any interrogation of Olsen, but that is not an issue before us.)[1]

---

[1] I recognize that language in some of this court's opinions suggests that excessive use of force, such as the unnecessary use of handcuffs, converts an investigative detention into an arrest. Our first opinion so stating was *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993), in which we wrote, "[E]ffectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios." *Id.* at 1463. But a more precise statement of the proposition appeared earlier in the opinion, where we said, "An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent." *Id.* at 1462. In other words, to say that certain police conduct converts a stop into an arrest is only to say that the conduct could only be justified, if at all, by probable cause. Opinions that have followed *Perdue* have addressed only whether the use of excessive force rendered the detainee's statements or consent to search inadmissible. *See, e.g., United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994). The analysis in these opinions would be essentially the same if we had said simply that the officers had used excessive force in a *Terry* stop, rather than saying that the stop became an arrest. *See, e.g., id.* at 1055-56. Indeed, prior to *Perdue*, we had criticized the approach of some courts in deciding that the degree of force used by officers could convert a stop into an arrest. *See United States v. Merritt*, 695 F.2d 1263, 1274 (10th Cir. 1982). In any event, none of the *Perdue* line of cases stands for the proposition that the continued detention of

(continued...)

Once King had interviewed the store clerk and called Discover Card, he unquestionably had probable cause to arrest Olsen.

In short, the only potential grounds I can see for a Fourth Amendment claim here are (1) the use of excessive force in throwing Olsen against the store window (which is a proper claim whether there was probable cause for an arrest or only reasonable suspicion for an investigative detention); and (2) the use of excessive force in handcuffing Olsen (if there was not probable cause for an arrest (contrary to my view) and there was no specific justification for the use of handcuffs).

## II. Eighth Amendment Claim

I agree that Mr. Olsen's Eighth Amendment claims against Layton City must fail. Contrary to the majority opinion, however, I would also affirm the summary judgment in favor of Officer King and Davis County on the Eighth Amendment claims against them. This is not a reflection on the seriousness of Olsen's medical condition. The record indicates that his OCD has caused him great suffering. Yet even viewing the evidence in the light most favorable to his claim, he has not produced sufficient evidence that the defendants violated the Eighth Amendment.

I begin with King. The sole basis for Olsen's Eighth Amendment claim against King arises out of King's driving Olsen to jail. According to Olsen, twice during the trip he told King that he was having a panic attack. He does not claim that he told King he

[1](...continued)
Olsen in itself became unlawful if excessive force was used.

suffered from OCD. He does not claim that he told King he needed medical attention. He does not claim that he told King he needed to take his medication. Indeed, although Olsen's briefs on appeal assert that King should have provided treatment for Olsen's panic attack, they do not state specifically what King should have done differently.

The custodial drive to jail apparently caused Olsen to suffer. But "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). King could be liable only if he "kn[ew] of and disregard[ed] an excessive risk to [Olsen's] health or safety," *id.* at 837, caused by his continuing to drive to jail rather than taking some other action (unidentified by Olsen on appeal) consistent with his duties as a police officer. The evidence simply does not support a finding that King had such culpable knowledge.

To assess the claim against Davis County, we look to what happened at the jail. Upon arrival at the Davis County Jail at 6:52 p.m., Olsen was brought into a pre-booking area, where he was asked a series of medical questions as part of a screening process. According to the screening sheet, he suffered from (1) diagnosed restlessness, (2) OCD (recorded incorrectly as "CDC"), (3) panic attack syndrome, (4) mild cardiovascular problems, (5) hypertension, and (6) a cold; and he had prescriptions for Biaxin and antihistamine. Olsen did not sign the authorization for medical examination and/or treatment while incarcerated, which appears at the bottom of the screening sheet.

Olsen testified that after the completion of the medical screening sheet, he was asked if he had anything in his pockets. He stated that he had two medications for OCD, Diazepam and Chlorpromazine. He took Diazepam once a day and had taken a pill before his arrest. He took Chlorpromazine twice a day but had not yet taken a pill that day. The jail officer told him that he had to turn over the medication.

While Olsen was still in the pre-booking area, the officers conducted a pat-down search. As part of the search, Olsen was asked to remove his belt, shirt, shoes, and socks. The officers inspect shoes and socks because they are common places to hide weapons. Olsen informed the officers that he did not want to take off his shoes and socks because he had OCD and was germophobic. According to Olsen, he was having a panic attack at this time, though his deposition testimony does not reveal whether he told the officers he was having a panic attack while he was being searched.

In the interest of their safety, the officers insisted that Olsen comply with their request that he take off his shoes and socks. Nevertheless, they provided him a chair to sit on so that his feet would not have to touch the floor. An officer testified that this was an accommodation, which made the search less safe because Olsen could more easily assault the officers from a seated position. After he took off his shoes and socks, the officers searched them, and gave Olsen his socks back. Olsen remained sock-footed for the remainder of his time in jail.

The officers then took Olsen into the booking area, where he was to check his possessions and be photographed and fingerprinted. While he was checking his possessions, Olsen told the officers that he had medicine for his OCD with him and that he needed it because he was having a panic attack. The officers, however, would not allow him to have the medicine, and they took it from him.

Olsen was then fingerprinted. Typically, before fingerprinting a prisoner, the officers ask the prisoner to wash his hands so that all oils and grease are removed, thereby ensuring a good quality print. Olsen protested. Again telling the officers that he was germophobic, he expressed his concern that there might be a lot of germs around the sink where he was to wash his hands. Contrary to their normal policy, the officers allowed Olsen to forego hand washing, and fingerprinted his unwashed hands. Additionally, although the officers ordinarily require prisoners to wash their hands after fingerprinting, they did not make Olsen do so.

After fingerprinting, Olsen was allowed into a day room where he placed phone calls and watched television. He was released on bail at 9:15 p.m., less than two-and-a-half hours after arriving at the jail.

Olsen asserts in his brief that he requested "medical attention" from the Davis County Sheriff's Department and that jail personnel denied his requests. But the only evidentiary support he provides for this assertion is a citation to a 60-page portion of his deposition testimony. Such an overbroad reference can be (and should be) disregarded by

the court. *See Gross v. Burggraf Const. Co*, 53 F.3d 1531, 1546 (10th Cir.1995). In any event, the record does not support the assertion. At most, Olsen informed county officials that as a result of his OCD, (1) he could not do certain things—namely, take off his shoes or wash his hands, and (2) he needed his medication. He never testified that he asked for medical assistance.

The Davis County prisoner intake policy has several provisions regarding the medical needs of prisoners. The Admission Search Procedure contains the following directive:

> A. Pre-booking Preparation . . . .
>> 3. . . . The intake floor receiving deputy will do the following:
>>> a. A medical check will be made to insure the prisoner is not in need of immediate care. . . .

App. 359. The section on Access to Treatment states:

> To communicate to prisoners the availability of health services within the Davis County Jail and the method of obtaining the services[:]
>
> Information about health care services will be communicated to all prisoners upon their arrival to jail. The instructions will be given verbally and/or written.
> A. Access to treatment information will include, but not be limited to:
>> 1. Doctor's sick call
>> 2. Emergency medical care
>> 3. Mental health needs
>> 4. Dental clinic
>
> B. This information will be communicated to each prisoner:

-11-

1. Verbally

    a. At the time of intake screening

App. 361.  Another provision addresses medication:

. . . Prisoners claiming to be on medication:

    a. Obtain the following information:
        1) Purpose of medication
        2) Dosage
        3) Description of medication
        4) Name of physician prescribing
        5) Date of prescription
        6) Last dose
        7) Pharmacy

    b.  The nurse will verify above information by calling:
        1) Prescribing physician
        2) Hospital
        3) Family to obtain:
            a) Prescription number, date, physician, name of medication.
            b) Purpose of medication

App. 362.  (Although this provision appears under the title, "Prisoners with communicable disease," the parties apparently agree that it applies more generally.)  Finally, the section entitled "Receiving Screening" twice deals with medical and psychiatric needs.  First:

Intake screening will be performed on all prisoners presented for incarceration at the Davis County Jail.  Screening prevents prisoners

-12-

who pose a health or safety threat to themselves or others from being admitted to the facility's general population.

Observation of inmates during the screening may prevent suicide, detect symptoms of drug withdrawals, recognize the signs of trauma the inmate may have received, and if he/she requires medical attention . . . .

A.    Receiving screening will be conducted during the initial booking process of the Davis County Jail and will be performed by medical staff and/or health trained correctional deputies.  The screening will include:

1.  Initial screening for emergency medical or psychiatric needs.

. . . .

3.  Documenting medical history

4.  Documenting prisoner's behavior and appearance.

B.    Receiving screening will be documented on the medical screening form . . . .

C.    Prisoners posing immediate health or safety threats to themselves or others are treated as follows:  [what follows is not in the record].

App. 363.  Later it states:

2.    It must be a matter of judgement weather [sic] or not to accept such a prisoner.  Remember, however, that the screener cannot diagnose the condition, and it might be more serious than seems apparent.  So when using judgment and common sense, it is determined the prisoner may have a problem, do not accept him until he has been medically cleared.

-13-

. . . .

O.     Prisoners exhibiting behavior indicative of psychiatric disorders or suicide threat (delusions, hallucinations, communication difficulties, speech and posturing, impaired level of consciousness, disorganization, memory defects, depression or evidence of self mutilations) will not be accepted without medical clearance.

App. 364.

From the above evidence, I do not see how an Eighth Amendment claim against Davis County can be sustained. Mr. Olsen fails on two grounds. First, the county is liable in damages only if an employee committed a constitutional violation. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986); *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1320 (10th Cir. 1998). But, as I will explain below, there was no constitutional violation. Second, even if an employee committed such a violation, Olsen's sole theory of county liability is that the county failed to train the jail employees to deal with prisoners suffering from OCD. Such failure-to-train liability can be imposed, however, only if the failure reflected the county's "'deliberate indifference' to the rights of its inhabitants." *Canton v. Harris*, 489 U.S. 378, 389 (1989). Olsen has failed to provide evidence of such deliberate indifference. I will now address each ground in more detail.

To establish a constitutional violation, Olsen must show that at least one jail employee "kn[ew] of and disregarded an excessive risk to [Olsen's] health or safety." *Farmer*, 511 U.S. at 837. (The requisite state of mind was referred to in *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991), as "deliberate indifference." Use of that term, however, can

-14-

cause confusion because the same term has a different meaning in the related context of municipal liability for constitutional violations by employees. As this court has explained: "In the prison conditions context, deliberate indifference is a *subjective* standard requiring actual knowledge of a risk by the official. In the municipal liability context, deliberate indifference is an *objective* standard which is satisfied if the risk is so obvious that the official should have known of it." *Barney v. Pulsipher*, 143 F.3d 1299, 1307, n.5 (1998) (emphasis added).) There is nothing in the record on appeal, however, to show that any staff member had the culpable state of mind required for an Eighth Amendment violation.

When Olsen complained about taking off his shoes and socks because of his fear of germs on the floor, jail personnel accommodated him by finding a chair so that his feet would not touch the ground. Although the officers could have accommodated Olsen further by not requiring him to remove his shoes and socks, there was a clear security purpose in checking those articles of clothing for such items as weapons or drugs. The Eighth Amendment does not require jails to forego reasonable security measures. *Cf. Bell v. Wolfish*, 441 U.S. 520, 546 (1979) ("The fact of confinement as well as the legitimate goals and policies of the penal institution limits . . . retained constitutional rights."). Similarly, the officers accommodated Olsen in the fingerprinting process by not making him wash his hands. The Eighth Amendment did not mandate that the jail refrain from fingerprinting him.

A similar analysis applies to taking medication from Olsen. Jail procedures required medical personnel to verify any prescription needs before a prisoner could be given medication. This practice makes obvious sense. Otherwise, prisoners could take unlawful or dangerous drugs, and prisons could be held responsible for not preventing such self-destructive behavior. The problem here is that the verification procedure was not completed during Olsen's incarceration of more than two hours. Such a delay in the context of this case may justify a finding of negligence by the county jail. But it is another matter altogether to find on this record that a county employee possessed the necessary culpable state of mind. The record is devoid of any evidence regarding the jail's actions after Olsen's Chlorpromazine was seized. One can only speculate regarding who was responsible for the delay and what that person's state of mind was. In my view, the record would not support a jury finding that some jail employee "kn[ew] of and disregard[ed] an excessive risk to [Olsen's] health or safety." *Farmer*, 511 U.S. at 837. Therefore, the summary judgment against Olsen on this claim must be sustained. *See Revell v. Hoffman*, 309 F.3d 1228, 1232 (10th Cir. 2002) (stating standard for summary judgment).

Moreover, even if a jail employee violated Olsen's rights under the Eighth Amendment, Olsen has not provided sufficient evidence to sustain his claim against Davis County. He asserts that OCD is so common that the county had an obligation to train jail personnel in how to handle prisoners suffering from the condition. The county intake policy, however, has provisions that would seem to respond reasonably to the medical

-16-

needs of prisoners. To prevail against the county, Olsen must show that "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need' for additional training." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Harris*, 489 U.S. at 390).

The question, then, is whether it was "obvious" that under the jail's policies, absent further training, jail personnel were likely to violate the Eighth Amendment rights of inmates with OCD by *knowingly* disregarding "excessive risk[s] to [their] health or safety." *Farmer*, 511 U.S. at 837. In my view, the record in this case does not establish such obviousness. Olsen's evidence concerns only the prevalence of OCD in the general population. He presents no evidence regarding prison populations. In particular, he presents no evidence regarding how often OCD manifests itself in ways that require special attention in a prison setting, the experience of prisons in dealing with inmates suffering from this affliction, or whether special training of jail personnel is necessary to avoid serious harm. Olsen's germophobia and severe reaction to jail conditions may, for all the record shows, be a rare occurrence among those who suffer from OCD.

In *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997), we said that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential

for such a violation, is sufficient to trigger municipal liability." Here, there is no evidence of such "recurring situations" in the Davis County jail.

We have also said that "[t]he deliberate indifference standard may be satisfied when the municipality has *actual or constructive notice* that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307 (emphasis added). I assume that "constructive notice" of a fact can arise when the fact is widely known by those in the particular field of endeavor. *See Harris*, 489 U.S. at 390 n.10 (police administrator's need to train officers in use of deadly force is plainly obvious). In *Allen* itself the plaintiff had properly relied on an expert who testified that the municipality's procedures were "out of synch with the rest of the police profession." 119 F.3d at 844. If this is a proper interpretation of "constructive notice," then Davis County could have constructive notice of an OCD problem (so that the problem is "obvious") based on information from outside the experience of its own jail. The record before us, however, contains no evidence of "best practices" in other prisons with respect to treating persons with OCD, nor does it refer to literature on the subject directed to prison administrators or other law enforcement personnel.

All the record contains is medical literature. But a matter cannot be considered "obvious" to jail administrators simply because it is well known to medical professionals or families of those affected by a particular disorder. Prison officials do not have

constructive notice of what appears in medical literature.  Because Olsen relies only on medical literature, and provides no evidence regarding what was known by Davis County jail administrators or by jail administrators in general, or even what happens in jails in general, he has not established the obviousness required for liability of Davis County.

In sum, although there are disputed facts in the record, there are no disputed *material* facts that could justify setting aside the district court's summary judgment on Olsen's Eighth Amendment claims.  I therefore respectfully dissent from the reinstatement of those claims against King and Davis County.